IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| BONNIE ANDERSON                    } | |
|                                     } | |
|     Plaintiff,        } | |
|                                     } | |
| v.                                  } | CIVIL ACTION NO. H-03-2873 |
|                                     } | |
| ULTRAVIOLET SYSTEMS, INC., ISMAIL   } | |
| GOBULUKOGLU, HARRELL ELLIS,         } | |
| IRETA ELLIS, and ERNEST SUMRALL     } | |
|                                     } | |
|     Defendants.       } | |

## OPINION AND SUMMARY JUDGMENT

        Pending before the court is the Motion of Defendants Ultraviolet Systems, Inc. (Hereinafter "UV Systems"), Harrell Ellis, Ireta Ellis (the "Ellises," unless referred to individually), and Ernest Sumrall ("Sumrall") for Summary Judgment (Docket Instrument No. 25.), and the Response (Doc. 35) of Plaintiff, Bonnie Anderson ("Anderson").  Also pending is Anderson' Motion for Leave to File Plaintiff's First Amended Complaint, filed April 15, 2005, in which Anderson wishes to add the theory that Defendant Gobulukoglu was a "vice principal" of UV Systems.  (Doc. 44)  The court will deny this untimely Motion for Leave to Amend (Doc. 44) which was filed approximately two weeks prior to the previously set docket call and well after the filing of Defendants' Motion for Summary Judgment.

        Anderson's Original Complaint (Doc. 1) asserted the court's jurisdiction under Title VII of the Civil Rights Act of 1964, alleged causes of action for *Quid Pro Quo* Sexual Harassment, Hostile Work Environment, Retaliation, Wrongful Discharge, Negligence, Intentional Infliction of Emotional Distress, and Invasion of Privacy.  The focal act of alleged harassment occurred on August 26, 2002, when the Plaintiff, Anderson, caught Defendant, Gobulukologu, attempting to take photographs under her clothing.  The court finds that Defendants' Motion for Summary Judgment (Doc. 25) should be granted.

I.                    **Standard of Review : Summary Judgment**

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.  *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986).  The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material; i.e., only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby*, 477 U.S. 248, 256-57 (1986).  The movant need not negate the opposing party's claims nor produce evidence showing the absence of a genuine issue of fact, but may rely on the absence of evidence to support essential elements of the opposing party's claims.  *Celotex*, 477 U.S. at 323-25.  However, "[o]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).  If it is evident that the party seeking summary judgment against one who bears the proof burden has no access to evidence of disproof, and ample time has been allowed for discovery, he should be permitted to rely upon the complete absence of proof of an essential element.  *Fontenot v. Upjohn,* 780 F.2d at 1195.  If the moving party fails to meet its initial burden, the motion must be denied, regardless of the non-movant's response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial.  Fed. R.Civ. P. 56(c).  The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 256-157.  The non-movant may point to evidentiary documents already in the record that set out specific facts showing the existence of a genuine issue.

*Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  Furthermore, the non-movant does not likewise have to present its own evidence, but may point out genuine issues of fact extant in the summary judgment evidence produced by the movant, if any.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198-200 (5th Cir. 1988).

## II.            Factual Background

Plaintiff, Anderson began her employment with Ultraviolet Systems, Inc. ("UV Systems"), on or about July 22, 2002, and her last day of work was September 19, 2002.  (Doc. 25, Ireta Ellis ("I. Ellis") Aff., Exh. 2, p. 3 ¶ 7; Anderson Depo., Exh. 1, p. 63.)  Anderson worked in the Purchasing area performing clerical duties and assisted, when needed, in the Information Technology (IT) area.  (Doc. 25, Anderson Depo., Exh. 1, pp. 64-65.)

Anderson was aware that UV Systems had a "zero tolerance" policy against sexual harassment, a copy of which was contained in an employee handbook she received when she began her employment; the handbook contained a prescription such that any employee believing a supervisor or employee to have committed acts constituting unwelcome harassment, had a responsibility to report the situation as soon as possible.  (Doc. 25, Anderson Depo., Exh. A., p. 76-77; Harrell Ellis ("H. Ellis") Aff., Exh. 2, ¶'s 12, 14; H. Ellis Depo. Exh. "A"; Key Aff., Exh. 9, ¶ 6; Sumrall Aff., Exh. 6, ¶ 23.)  All employees, including Anderson and Gobulukoglu, were expected to read and understand the employee handbook and ask questions if they did not understand it; and, both Anderson and Gobulukoglu signed acknowledgements that they understood the handbook provisions, including the sex harassment provisions contained therein. (Doc. 25, Anderson Depo., Exh. 1, pp. 71-72; H. Ellis Aff., Exh. 2, ¶ 12; H. Ellis Depo. Exh's "B" & "C";  Sumrall Depo., Exh. 7, p. 37.)

As was expressed in the employee handbook which Anderson received, she, as well as all UV Systems employees, was an "employee-at-will."  (Doc. 25, H. Ellis Aff., Exh. 2, ¶ 12; I. Ellis Aff., Exh. 4, ¶ 7.)  During her two months of employment at UV Systems (July 22, 2002 - September 19, 2002) Anderson was also covered by the company's worker's compensation insurance policy which provided insurance coverage for work-related injuries.  (Doc. 25, H. Ellis Aff., Exh. 2, ¶ 22; H. Ellis Depo. Exh. "H.")  During her employment at UV Systems, Anderson's supervisor, the person to whom she directly reported, was the General Manager, Ernest Sumrall ("Sumrall").  (Doc. 25, Anderson Depo., Exh. 1, p. 74.)  Gobulukoglu was not Plaintiff's

supervisor; Gobulukoglu did not supervise any employee or possess any supervisory authority, such as the authority to hire, fire, discipline, promote, transfer, designate pay or benefits, or direct the work assignments of either Anderson or any employee.  (Doc. 25, H. Ellis Aff., Exh. 2, ¶ 9; I. Ellis Aff., Exh. 4, ¶ 5; Sumrall Depo., Exh. p. 37, 116).

During her employment, the central incident of alleged sexual harassment experienced by Plaintiff was the incident which occurred on August 26, 2002.  (Doc. 25, Anderson Depo., Exh. 1, pp. 58-60.)  This event occurred as follows.  Anderson had assisted Gobulukoglu with ordering a replacement liquid cystal display screen for his company issued laptop computer, and on August 26, 2002, she came to Gobulukoglu's office at his request to install said screen on the laptop.  (Doc. 37, Anderson Depo., Exh. A, pp. 81-82; Sumrall Depo., Exh. C, p. 100.)  Anderson worked on Gobulukoglu's laptop for two hours, sitting directly at his desk part of the time, with her legs in the "cutout" or "kneehole" of his desk, with Mr. Gobulukoglu sitting to her right, standing around the desk, or in various positions, when he was in the office with her; Anderson was wearing a skirt at the time.  (Doc. 37, Anderson Depo., Exh. A, at pp. 83-85, 87.)  After two hours, she noticed at one point that Gobulukoglu's arm was hidden beneath his desk, and as another employee (Zach Crowe) entered the office, she looked under the desk at his arm and saw that he was holding a camera.  (Doc. 37, Anderson Depo., Exh. A, pp. 84, 86-87.)

Prior to August 26, 2002, the date of the incident, Anderson admits Gobulukoglu never said or did anything that caused her to think or believe that he was interested in her in any fashion; he never said or did anything she considered to be sexually offensive or provocative; and, Gobulukoglu never did anything to cause Anderson to think that he was trying to take her picture. He was always cordial, professional, civil, and courteous, which is why she agrees his activity shocked her.  (Doc. 25, Anderson Depo., Exh. 1, pp. 88-89, 93.)  When Anderson's supervisor, Sumrall, came back from lunch on August 26th, Anderson reported to him that she had been in Gobulukoglu's office when she had seen the latter with a camera in his hand under his desk, and she suspected he was taking pictures of her.  (Doc. 25, Anderson Depo., Exh. 1, pp. 78, 95-96, & 97-98.)

Anderson testified Sumrall told her to go wait in a cubicle or room, i.e., Bill Sparks' Office, where she states she proceeded to wait without talking to anyone for three hours.  (Doc. 37, Anderson Depo., Exh. 1, pp. 97-99.)  She states Sumrall told her he would get Zach Crowe, another employee, and together they would go to Gobulukoglu's office, approach him, and

determine if he had been taking pictures; Sumrall testified Anderson complained to him that she suspected Gobulukoglu had been taking pictures of her for weeks, and he decided to bring along Zach Crowe, the then "acting information technology guy" and "the most knowledgeable IT guy [the company] had."  (Doc. 37, Anderson Depo., Exh. 1, pp. 95-96; Doc. 25, Sumrall Depo., Exh. 7, p. 124.)

   The summary judgment evidence submitted shows Sumrall confirmed that Gobulukoglu had taked pictures of Anderson with a digital camera belonging to the company.  (Doc. 37, Sumrall Depo., Exh. D, pp. 99-100, 123-24; Sumrall Aff., Exh. 6, ¶¶'s 5-8)  Crowe states that in looking at the LCD screen of the digital camera retrieved from Gobulukoglu's desk, he could see photographs of an ankle, a knee cap, and a leg; Sumrall confirms that he saw two or three pictures which depicted a female's hemline and lower leg, or from hem to "mid-calf," which was "inappropriate enough" for him to take some action.  (Doc. 25, Crowe Aff., Exh. 8, ¶¶'s 5-8; Sumrall Depo., Exh. 7, p. 110; Sumrall Aff., Exh. 6, ¶ 7.)  Crowe later found several pornographic compact disks in Gobulukoglu's desk.  (Doc. 25, Exh. 8, ¶ 12.)  Crowe downloaded the images from the digital camera to the laptop. He recalled that of the 15 or 30 photographs taken, about three photographs showed Anderson's leg and underwear.  (Doc. 25, Crowe Aff., Exh. 8, ¶¶'s 13, 15.)  According to Crowe, all photographic images, the laptop itself, and the pornographic compact discs were turned over intact to the Houston Police Department.  (Doc. 25, Crowe Aff., Exh. 8, ¶ 13, 16.)  Crowe has averred he did not show the photographs to anyone except Anderson and the group who was involved in investigating this matter.  (Doc. 25, Crowe Aff., Exh. 8, ¶ 17.)  He recalls that Ireta Ellis, co-owner of UV Systems with husband Harrell Ellis, may have seen a few photographs at the same time Anderson looked at the laptop images, and that Sumrall may have seen a photograph or two on the camera and laptop, but he did not show any photographs to his supervisors Bill Sparks or Greg Ellis.  (*Id*.)  Defendant argues that only a limited number of employees and company officials viewed Defendant Gobulukoglu's photographs of the Plaintiff, and none of those photographs depicted sexually explicit views of the Plaintiff's anatomy. Anderson argues that UV System's actions directly contradicted Anderson's request that any existing photographs not be reviewed by anyone at the company, as she had already suffered embarrassment and wished to avoid compounding the problem.

   Following this incident, Anderson argues the laptop and equipment in Gobulukoglu's office were improperly stored and/or handled by Defendant.  (Doc. 35, p. 3.)

Anderson testified that she was shown 23 pictures taken of her by Gobulukoglu, and two of the pictures, she alleges were taken looking up her skirt, showing legs and underwear.  (Doc. 37, Anderson Depo., Exh. A, pp. 136-137.)  Anderson states she was told by an investigative officer that because the pictures had been downloaded from the camera and deleted, and because the computer had not been kept locked and untouched, "it was considered tampered with and [the police] couldn't use it as evidence."  (Doc. 37, Anderson Depo., Exh. A, pp. 148-49; Sumrall Depo., pp. 99-100.)  Plaintiff argues UV Systems destroyed the pictures on Gobulukoglu's camera and laptop computer.

Sumrall testified that because he did not intend for anyone to come into contact with, damage, or destroy the pictures until Detective Garretson came and retrieved the laptop, Sumrall instructed Crowe to take the laptop home each night, search it for additional material, and to maintain control and possession of the laptop until it could be taken by the police.  (Doc. 35, Sumrall Depo., Exh. C, p. 172.)  Crowe downloaded the photographs before he started going through the computer to make sure they were not lost.  (Doc. 25, Sumrall Depo., Exh. 7, p. 161.)  Additional photographs were found on the laptop.  (Doc. 37, Anderson Depo., Exh. 1, p. 91.)  Crowe avers that when giving all photographic evidence in his possession to the police, the latter did not indicate that the evidence had been mishandled, and that he is certain the evidence was kept intact until turned over to the police.  (Doc. 25, Crowe Aff., Exh. 8, ¶ 16.)

Gobulukoglu was very distraught and apologetic upon being confronted by Sumrall; Sumrall proceeded to immediately suspend Gobulukoglu and removed him from the premises with instructions that he was not to return without permission and that he was not to contact Plaintiff (to apologize or for any other reason).  (Doc. 25, Sumrall Aff., Exh. 6, ¶¶'s 8-9; Crowe Aff., Exh. 8, ¶ 8.)  The day after the incident was reported, the situation was reviewed by the owners of the company, Harrell and Ireta Ellis.  (Doc. 25, H. Ellis Depo., Exh. 2, ¶ 4; I. Ellis Depo., Exh. 4, ¶ 3.)  Harell Ellis avers that because Anderson told him she would not feel comfortable working around Gobulukoglu, he determined that the appropriate action to take would be to discharge Gobulukoglu.  (Doc. 25, H. Ellis Aff., Exh. 2, ¶ 5.)  (H. Ellis Aff. Exh. 2, ¶¶'s 17, 20; I. Ellis Aff. Exh. 4, ¶¶'s 4, 20, and ¶¶'s 4, 9).

Defendants argue that the complaint made by Plaintiff was the first and only complaint by anyone against or about Gobulukoglu.  (Doc. 25, ¶ 9.)  By all accounts Gobulukoglu was soft-spoken, polite, courteous, friendly, professional, devoted to his wife and family, and gave

no outward signs that he might engage in inappropriate behavior.  (Doc. 25, H. Ellis Aff., Exh. 2, ¶¶'s 10-11; I. Ellis Aff., Exh. 4, ¶¶'s 5; Sumrall Aff., Exh. 6, ¶ 4; Crowe Aff., Exh.8, ¶ 6; Key Aff., Exh. 9, ¶ 5; Polk Aff., Exh. 10, ¶ 8.)   Defendant Gobulukoglu did not have a history of inappropriate behavior, and there is no evidence that he was an unfit employee.  (Doc. 25, Anderson Depo., Exh. 1, p. 88-91, 93; H. Ellis Depo., Exh. 3, p. 78.)  Defendant Gobulukoglu was the only employee who allegedly sexually harassed Anderson, and Plaintiff admitted that the corrective action taken (suspension, then termination) was appropriate under the circumstances. (Doc. 25, Anderson Depo., Exh. 1, pp. 103, 130.)

Approximately four weeks after Defendant Gobulukoglu was fired, Anderson voluntarily resigned her position with less than two weeks' notice, and Harell Ellis avers she did so without being asked to leave, or being forced or encouraged to quit.  (Doc. 25, H. Ellis Aff., ¶ 19; I. Ellis Aff., Exh. 4, ¶ 7.)  At no time prior to her leaving, did Anderson indicate to Harell Ellis that she felt uncomfortable at work or was being pressured to resign.  (Doc. 25, H. Ellis, Aff., ¶ 19.)  Shortly thereafter, she went to work for a different employer.  (Doc. 25, Anderson Depo., Exh. 1, p. 181.)

Plaintiff filed a charge against UV Systems with the EEOC claiming sex harassment, hostile work environment, and retaliation.  Her charge was investigated and dismissed by the EEOC because the investigation did not find a violation of Title VII had been committed. (Doc. 25, H. Ellis Aff., Exh. 2, ¶¶'s 20-21; *See also* Doc. 1, Plaintiff's Original Complaint, "Charge of Discrimination," Exh. A.)  The EEOC issued to Plaintiff a right-to-sue letter, dated March 20, 2003, by certified mail.  (Doc. 25, Anderson Depo., Exh. 1, p. 192.)  Plaintiff did not receive the right-to-sue letter until weeks later, because she did not pick up the certified letter from the post office.  (Doc. 25, Anderson Depo., Exh. 1, p. 194-195.)  In a 're-sent' letter from the EEOC dated April 30, 2003, Anderson was told that "if [she files] a lawsuit, [she] must file it within 90 days from your receipt of this notice."  (Doc. 1, Plaintiff's Original Complaint, "Charge of Discrimination," Exh. B.) Defendants argue Anderson did not file suit until July 28, 2003, more than ninety days after the initial right-to-sue letter was mailed to her residence address by the EEOC on March 20, 2003.  (Doc. 25, p. 9; Anderson Depo., Exh. 1, p. 199; H. Ellis Aff., Exh. 2, ¶ 21.)  Anderson admits that she received a green certified mail card at the time of the first letter, notifying her that she had mail to pick up, and although she claims she did not know the letter for

pick up was from the EEOC, she nevertheless called the EEOC to ask that the agency send another letter to her work address.  (Doc. 25, Anderson Depo., Exh. 1, pp. 194, 197.)

III.        Analysis

A. Preliminary Matters

Initially, Defendants raise the argument that Anderson's Title VII claims are barred because she failed to file suit within 90 days of receiving the EEOC's right-to-sue-letter.  Second, Defendants clarify that Title VII also does not impose liability against individual employees, including Harrell Ellis, Ireta Ellis, and Ernest Sumrall, because they do not qualify as "employers."

Seven days from Anderson's receipt of the EEOC's certified remittance or 're-sent' notice of April 30, 2003 (Doc. 1, Exh. B) would have afforded Anderson at least until July 28, 2003, to file her complaint.  *Taylor v. Books A Million*, 296 F.3d 376, 379 (5th Cir. 2002) (the requirement is strictly construed that a lawsuit be filed within 90 days after receipt of notice from the EEOC.)  The issue arises whether Anderson's receipt of notice from the EEOC should be taken as of the time of Anderson's failure to retrieve her certified mail from the post office at some point after March 20, 2003, at the time she called the EEOC to find out why she had not received her letter, the April 30, 2003 date printed on the re-sent letter, or the indeterminate date when the re-sent letter was actually received.  (Doc. 25, Anderson Depo., Exh. 1, p. 199.)  The 90-day period begins to run when notice is *received*.  *Taylor*, 296 F.3d at 379.  If the court were to treat the second EEOC letter as the controlling letter for purposes of notice, and if the court were to apply a seven day time period for receipt after the date the EEOC mailed its letter using the date of the letter, under the presumption of receipt doctrine such an extension would have made Anderson's claim timely.  *Id*. at 380.  However, the court follows that precedent which dictates that "in circumstances where a plaintiff does not claim her certified mail, the ninety-day period is triggered upon delivery of the notice of the certified mail, not when the letter is actually picked up."  *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733 (S.D. Tex. 2003) (citing *Lee v. Henderson*, 75 F. Supp. 2d 591, 593-94 (E.D. Tex. 1999) (citing cases)).  Anderson admits she received a card telling her she had received certified mail, but explains she did not make it to the post office to pick-up the letter before the post office closed.  (Doc. 25, Anderson Depo., Exh. 1, p. 194.)  Applying the seven day presumptive receipt doctrine to the date of her first right-to-sue letter, March 20, 2003 (Doc. 1, Exh. A), Anderson had to file her suit ninety (90) days from March 27, 2003, or at some

time at the end of June, approximately a month before she actually filed suit on July 28th. Therefore, Andersons claims are barred by virtue of being untimely. The court has nevertheless analyzed these claims on the merits and determined they must be dismissed.

The court agrees with Defendants that Title VII does not permit the imposition of liability upon individuals, unless they meet Title VII's definition of an "employer." *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir. 1994).[1] "Under established Fifth Circuit precedent, individual employees, even those functioning in a management capacity,... cannot be held personally liable under Title VII." *Patton v. United Parcel Service, Inc.*, 910 F.Supp. 1250, 1269-70 (S.D. Tex. 1995). Title VII defines "employer" to include any agent of an employer. *Id*. (citing 42 U.S.C. § 2000e(b)). UV Systems was the only party against whom Anderson filed an EEOC charge. (Doc. 1, Original Complaint, Exh. A; Doc. 25, H. Ellis Depo. Exh. F.) Title VII requires that Anderson exhaust her administrative remedies by filing a charge with the EEOC against her employer. *Taylor*, 296 F.3d 379 (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996)). Furthermore, Anderson now asserts that she never asserted Title VII claims against Harrell or Ireta Ellis or Ernie Sumrall, and that UV System's request for summary judgment as to the Title VII claims against such individuals should be *moot* in this respect. (Doc. 37, p. 11, ¶ E.)

The court will therefore dismiss Anderson's *Quid Pro Quo* Sexual Harassment, Hostile Work Environment, Retaliation, and Wrongful Discharge claims against all Defendants except UV Systems.

### B. Legal Analysis of Sexual Harassment

Defendants proceed to argue that Anderson's Title VII claim of quid pro quo sexual harassment must fail because (i) Anderson was not subjected to requests for sexual favors or sexual advances from a supervisor as a condition of her employment, and because (ii) she did not suffer a tangible adverse employment action for reporting Gobulukoglu's conduct. (Doc. 25, p. 2.) Further, Defendants argue that Anderson's Title VII claim of hostile work environment harassment must fail because (i) the alleged harassment in question was not sufficiently severe or pervasive

---

[1]The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person....  42 U.S.C. § 2000e(b).

enough so as to alter the terms and conditions of her employment and to create an abusive work environment, and because (ii) there is no evidence that Defendants knew or should have known of the alleged harassment and failed to take prompt remedial action.

### (i) Supervisor Status and Tangible Employment Actions

The court must first determine whether a negligence or vicarious liability standard applies to Anderson's allegations against UV Systems, a question necessarily involving whether Gobulukoglu was Anderson's co-worker or supervisor.  This is because an employer can be directly liable for the conduct of a co-worker, where its own negligence is a cause of the harassment; an employer is negligent with respect to sexual harassment if it knew or should have known about the conduct but failed to stop it.  See *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) (citing *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998)).  To state a hostile work environment claim under Title VII regarding harassment by a co-worker, a plaintiff must prove (1) that she belongs to a protected class, (2) that she was subject to unwelcome sexual harassment, (3) that the harassment was based on sex, (4) that the harassment affected a term, condition or privilege of employment, and (5) that the employer knew or should have known about the harassment and failed to take prompt remedial action.  *Woods v. Delta Beverage Group., Inc.*, 274 F.3d 295 (5th Cir. 2001) (citing *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 873 (5th Cir. 1999)); *See also Long v. Eastfield College*, 80 F.3d 300, 309 (5th Cir. 1996) (citing *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir. 1993)).  As noted in *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 353-54 (5th Cir. 2001), this well established five-part test underwent relatively recent change with respect to harassment which is created by a supervisor.

An employer is subject to vicarious liability to a victimized employee for actions of a supervisor with immediate (or successively higher) authority over that employee.  See *Burlington Indus., Inc., v. Ellreth*, 524 U.S. 742, 765 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  In cases in which an employee asserts a harassment claim against a supervisor, the employee need only satisfy the first four elements of the traditional Title VII test, at which point the employer may seek to prove an affirmative defense; however, the standard five-part test continues to apply to harassment from co-workers.  *Woods*, 274 F.3d at 298 n.2.

Whether Gobulukoglu was Anderson's supervisor "begins with an analysis of [Gobulukoglu's] job position vis-à-vis [Anderson]." *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 411 (5th Cir. 2002).  There is no evidence that Gobulukoglu was Anderson's supervisor or that he supervised her daily activies.  *Id.*  Anderson argues that Gobulukoglu had supervisory authority because he was titled a "Director," he was listed on the company's website in a managerial role, and Anderson argues she installed an LCD screen at his behest - proof of his authority.[2]  (Doc. 37, p. 5.)  Under Title VII, vicarious liability is predicated on misuse of supervisory authority, the touchstone of supervisory status being the extent of authority possessed by the supervisor, a determination necessarily hinging on the alleged supervisor's job functions and powers as opposed to his title.  *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998) (citing cases).  As UV Systems points out, however, and as Anderson does not contest, Gobulukoglu did not have the authority to hire or fire Anderson, to suspend or terminate her employment, to discipline her, to promote or transfer her, to direct her work assignments, to evaluate her performance, to cause her pay to increase or decrease, or to determine her work schedule or time off.  (Doc. 25, p. 11.)  Therefore, the court would by necessity have to apply the co-worker sexual harassment standard in this action because the court does not find that Gobulukoglu was Anderson's supervisor.  Nevertheless, assuming *arguendo* that Gobulukoglu was Anderson's supervisor, the court will explain why Anderson's supervisor claims would fail as a matter of law even if such were considered.

Under the supervisor standard, to determine whether a *quid pro quo*, or hostile work environment harassment standard applies, the court must first determine whether the complaining employee has suffered a "tangible employment" action.  *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000).  "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.  A tangible employment decision requires an official act of the enterprise, a company act."  *Butler v. Yselta Independent School District*, 161 F.3d 263, 268 (5th Cir. 1998) (citing *Burlington*, 524 U.S. at 762.)  The court noted in *Burlington* that a tangible employment action "constitutes a significant change in employment

---

[2] Anderson's deposition testimony bears out that Gobulukoglu requested whether he could stay and watch her change the screen to learn the process, and other than helping him with his laptop a couple of times or answering a question from him about purchasing (either occasionally or almost every day), there is no further evidence of interaction between Anderson and Gobulukoglu presented. (Doc. 25, Anderson Depo., Exh. 1, pp. 82, 95; Doc. 37, Anderson Depo., Exh. A, p. 85.)  However, Anderson has also stated that Sumrall was her supervisor.  (Doc. 25, Anderson Depo., Exh. 1, p. 74.)

status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," and, in most cases, "inflicts direct economic harm." *Burlington*, 524 U.S. at 762.  In *Kroger*, the court stated that changing one's work schedule, increasing one's duties by adding tasks, or asking that the employee to check with a supervisor before taking breaks do not constitute a "significant change in employment status." *Watts v. Kroger Co.*, 170 F.3d 505, 510 (5th Cir. 1999).  None of the actions alleged by Anderson qualify as a tangible employment action, except potentially her resignation if it qualifies as a constructive discharge; constructive discharge can satisfy the injury element or be used to show the "adverse employment action" in a plaintiff's prima facie Title VII case. *Tyler v. Union Oil Co.*, 304 F.3d 379, 394 (5th Cir. 2002) (citing *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997)).[3]  However, as shown below, because the court does not find that any harassment experienced by Anderson rose to an actionable level as a matter of law, her constructive discharge claim must fail because such a claim requires actions even more severe than a harassment claim. Furthermore, Anderson's resignation occurred three weeks after Gobulukoglu's termination, and the logical connection between her resignation and Gobulukoglu's picture taking is highly attenuated, if at all extant.  This is not a case where a logical connection exists between a supervisor's alleged act of sexual advancements or harassment toward an employee where the supervisor proceeds to personally take action against the employee for rejecting these demands or behavior.  Anderson did not suffer any tangible employment action resulting from her failure to submit to Gobulukoglu's alleged sexual harassment; there is no evidence, as indicated by Anderson at her deposition, that anyone at UV Systems, including Gobulukoglu, ever solicited sexual favors from her in exchange for a promotion, nor threatened to terminate her employment, cut her pay, or demote her if she refused to submit to sexual advances.  (Doc. 25, Anderson Depo., Exh. 1, p. 185.)  *See Butler*, 161 F.3d at 268.

Furthermore, to the extent Anderson alleges that other actions at UV Systems functioned as "tangible employment actions," such as greater concentration paid to her arrival times at work or to her computer usage, the Fifth Circuit Court of Appeals has held that increased

---

[3]One district court has stated that "the term 'tangible employment action' seems to be the functional equivalent of the Fifth Circuit's terms 'ultimate employment decision' and 'adverse employment decision.' *Pfeil v. Intecom Telecommunications, et al.*, 90 F. Supp. 2d 742, 747 (N.D. Tex. 2000).  In *Kroger*, however, the Court of Appeals stated that it would not reach the question whether "tangible employment actions" as defined by *Burlington*, were identical to adverse employment actions as found in *Mattern v. Eastman Kodak, Co.*, 104 F.3d 702, 707 (5th Cir. 1997).  *See Kroger*, 170 F.3d at 510 n.4.

criticism of an employee's work does not constitute a tangible employment action.  *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707-08 (5th Cir. 1997) (addressing that "events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee – anything which *might* jeopardize employment in the future" were not ultimate, adverse employment actions)); *See also Thompson v. Naphcare, Inc.*, 117 Fed. Appx. 317, 323 (5th Cir. 2004) (not designated for publication).

### (ii) Hostile Work Environment

Because the court does not find that Anderson's allegations show she suffered a tangible employment action, the court must proceed to analyze the issues under a "hostile environment" rubric, under which an employer is also able to assert the *Ellreth/Faragher* affirmative defense.  *Casiano*, 213 F.3d at 283-84; *See also Kroger*, 170 F.3d  at 509-510 (the defense allows the employer to show "(a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.")

However, before such a defense need even be raised the court notes that both the co-worker and supervisor "standards" require the Anderson to establish the elements of her prima facie hostile work environment claim, which, in turn, requires proof of harassment that affects a term, condition, or privilege of employment.  *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 299 n.2 (5th Cir. 2001).

### (a.) Harassment That Affects a Term, Condition or Privilege of Employment

For harassment to affect a "term, condition, or privilege of employment" it must be "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment."  *Celestine*, 266 F.3d at 353 (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)).  *See also Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (citing *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996)).

In order to be actionable, a sexually objectionable comment must be both objectively and subjectively offensive, "one that a reasonable person would find hostile or abusive,

and one that the victim in fact did perceive to be so."  See *Butler*, 161 F.3d at 269 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)).  Furthermore, whether an environment is hostile or abusive depends on a totality of the circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance [destroying a protected classmember's opportunity to succeed in the workplace]."  *Id*. at 269-270.  (citing *DeAngelis v. El Paso Municipal Police Officers Assoc.*, 51 F.3d 591, 593 (5th Cir. 1995) (hostile work environment based on sexual harassment)).  The Fifth Circuit Court of Appeals has added to this non-exclusive list, an inquiry into "whether the complained of conduct undermined the plaintiff's workplace competence."  *Id*. at 270.

First, the conduct forming the basis of Anderson's claim was, by Anderson's admission, an isolated incident; and, the incident cannot alter the conditions of her employment unless extremely serious.  *Faragher*, 524 U.S. at 788.  Though Gobulukoglu's action may have been boorish and offended Anderson, it did not rise to the level of being severe and abusive.  See *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (court found that excerpted material given to plaintiff by supervisor concerning the controlling and corruptive "Spirit of Jezebel" was meant as a retributive epithet, and while it deeply offended plaintiff, was an isolated incident, wounding or offending without destroying opportunity to succeed); *Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir. 1996) (finding single joke involving condoms insufficient); *See also DeAngelis*, 51 F.3d at 596 ("four printed derogatory references to [plaintiff] at irregular intervals in two and a half years do not evince sufficient hostility toward her as a matter of law.")  The court disagrees with Anderson that the actions in this case equal the severity of the harassment suffered by Beverly Ross in *Ross v. Double Diamond, Inc.*, 672 F. Supp. 261, 271-73 (N.D. Tex. 1987).  The court agrees with UV Systems that Gobulukoglu's act is similar to the offending employee's actions in *Shepherd Comptroller of Pub. Accounts of the State of Texas*, wherein plaintiff's co-worker and brother-in-law, with whom plaintiff "engaged in friendly discussions" on a daily basis, told plaintiff on one occasion that "[her] elbows are the same color as [her] nipples;" once simulated looking under her dress while remarking that she had "big thighs;" on several occasions attempted to look down her clothing; on several occasions touched her arm, rubbing it from wrist to shoulder; and, during two office meetings, while pointing to his lap, stated, "here's your seat." 168 F.3d 871, 872 (5th Cir. 1999).  The Court of Appeals found such comments, occurring over one to two years,

intermittently, "boorish and offensive" but not severe.  "None of Moore's actions physically threatened Shepherd.  Nor would Moore's conduct interfere unreasonably with a reasonable person's work performance.  Furthermore, Moore's actions did not undermine Shepherd's workplace competence" or explicitly or implicitly contend that plaintiff was incompetent because of her sex.  *Id.*, 168 F.3d at 874 (citing *Butler*, 161 F.3d at 269.)  As in *Shepherd*, "[Gobulukoglu] never propositioned plaintiff, asked her out on a date, or suggested that he would like to sleep with her."  *Shepherd*, 168 F.3d 871, 873 (5th Cir.1999); *See also DeAngelis*, 51 F.3d at 596 ("...[n]o physical or sexual advances were made on [plaintiff], as has been characteristic of many hostile environment claims.")  Therefore, the frequency of Gobulukoglu's conduct, its single occurrence, undermine it as a matter of law.

Gobulukoglu's conduct also does not rise to the level of severity or abusive and sexually hostile activity present in prior precedent.  See *Waltman v. International Paper Co.*, 875 F.2d 468, 470-71 (plaintiff was exposed to publicly broadcasted humiliation, subjected to obscenities, pornographic graffiti and lewd comments directed at her from 80% of her co-workers, was groped, grabbed, subjected to violent comments, dangled over a stairwell, and propositioned and urged to have sex with co-employees.); *Sharp*, 164 F.3d at 926-7 (her direct supervisors subjected plaintiff to frequent and demeaning comments about her body, sexual jokes and suggestions, propositioned her, and would use work-related situations to tell her to perform sexual acts in front of others); *Green v. Administrators of the Tulane Educational Fund*, 284 F.3d 642, 656 (5th Cir. 2002) (sufficiently severe and pervasive conduct was involved when supervisor with whom plaintiff had previously had an intimate relationship reprimanded, demoted, cursed at, and humiliated plaintiff, intentionally interfering with her work performance).  "A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."  *DeAngelis*, 51 F.3d at 593.  "Any lesser standard of liability, couched in terms of conduct that sporadically wounds or offends but does not hinder a female employee's performance, would not serve the goal of equality."  *Id*.

Furthermore, although Anderson states she was "led to believe" she was not wanted in the workplace after the incident with Gobulukoglu (Doc. 25, Anderson Depo, Exh. 1, pp. 153-54), a party's subjective beliefs about discrimination are not competent summary judgment evidence.  *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40

(5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825 (1992); *Swanson v. General Serv. Admin.*, 110 F.3d 1180, 1186 (5th Cir. 1997); *See also Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (citing *E.E.O.C. v. Louisiana Office of Community Services*, 47 F.3d 1438, 1448 (5th Cir. 1995)).

Therefore, the court does not find that Anderson has alleged a sexually hostile work environment claim under either the supervisor or co-worker standards.  The court reiterates that it did not find that Gobulukoglu could be considered Anderson's supervisor under the law in any way, but the court has nevertheless hypothetically analyzed any potential claims for supervisory harassment.  As a final note and for the sake of argument, the court would emphasize that under a co-worker standard, UV System's response to Anderson's complaint on the day of the incident indicates that UV Systems would be able to succeed on its co-worker affirmative defense.

### (iii.) The Employer's Actions and Affirmative Defenses
#### (a.) Co-Worker Affirmative Defenses

Under a co-worker rubric, Cardwell would have to show that a genuine issue of fact exists for trial with respect to the fifth element of her *prima facie* case in order for her case to proceed to trial.  Defendants raise their affirmative defense, arguing that even if Anderson could establish the *prima facie* elements of her hostile work environment and wrongful discharge claims, those claims must fail because, as a matter of law, an employer is liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action.  *Nash v. Electrospace System, Inc.*, 9 F.3d 401, 404 (5th Cir.1993).

A Title VII employer has actual knowledge of harassment that is known to higher management.  *Sharp*, 164 F.3d at 929.  Higher management means someone with "remedial power" or authority to address a problem, with power to make employment decisions, and it is this person who must have actual knowledge of the harassment.  *Id*. at 930.  UV Systems may also be liable if it had *constructive* knowledge, i.e., "if through the exercise of reasonable care it should have known what was going on but failed to address it."  *Sharp*, 164 F.3d at 930.  To impute constructive knowledge to an employer, a person whose actual knowledge would have imputed knowledge to the employer has to have at least constructive knowledge.  *Id.*

There is no evidence to support Anderson's contention that the Defendants knew or should have known of the alleged harassment and failed to take prompt remedial action. Though Anderson alleged in her complaint that Defendant Gobulukoglu "had a history of making similar photographs/unwanted sexual advances to other employees," a "promiscuous history" which UV Systems knew or should have known (Doc. 1, Plaintiff's Original Complaint, ¶¶'s 18 & 19), there is no factual basis for this allegation, and Anderson has admitted Gobulukoglu never engaged in any behavior she felt was harassing and admitted she did not have information that Defendants knew Gobulukoglu was taking pictures of her or anyone else. (Doc. 25, Anderson Depo., Exh. 1, pp. 89-91, 93-94.) The evidence has shown that the picture taking incident involving Gobulukoglu was "out of character" for him in light of the way people perceived him.

Furthermore, the parties do not dispute that an employment harassment policy was in effect at the time of the alleged harassment. As discussed supra, UV Systems had a policy in place specifically prohibiting "verbal or physical conduct by an employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive or hostile environment;" the policy had procedures in place for making complaints of harassment; and, both Anderson and Gobulukoglu acknowledged receipt of the policy. (Doc. 25, H. Ellis Depo., ¶¶'s 12, 14 & H. Ellis Depo. Exh. A, B, C & D.) Whether or not there was a policy in existence at the time of the harassment, Anderson demonstrated her knowledge that she could go to a supervisor and complain by in fact going to Summrall, who was her supervisor, to complain about Gobulukoglu on the day of the incident. The evidence shows that Anderson in fact complained to Sumrall immediately regarding Gobulukoglu's actions, that the owners of the company, Harrell and Ireta Ellis immediately became involved, and that Gobulukoglu was escorted from the building, investigated, and terminated. If Gobulukoglu had engaged in other harassment prior to August 26th, or if any other employer engaged in such harassment after his termination, Anderson did not report such actions, nor did she report harassment she suffered from fellow employees. And in fact, UV Systems met its burden by taking prompt remedial action, sending Gobulukoglu home on the day of the incident, investigating Anderson's allegations by looking for photos, and discharging Gobulukoglu. Because UV Systems would be able to establish its affirmative defense, the court now turns to Anderson's other claims.

### C.     Retaliation

Anderson's claims of retaliation cannot succeed because (i) there is no evidence of a causal connection between her opposition to any alleged harassment and any alleged retaliatory acts and because (ii) there is no evidence that she suffered an adverse employment action.

To prevail on a claim for retaliatory discharge under Title VII, 42 U.S.C. § 2000e-3(a), a plaintiff must initially make a prima facie case by showing by a preponderance of the evidence that (1) she engaged in an activity protected by Title VII, (2) the employer took an adverse employment action against her, and (3) there was a causal connection between the protected activity and that adverse reaction. *Mota v. The University of Texas Houston Health Science Center*, 261 F.3d 512, 519 (5th Cir. 2001); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995); *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983).  The plaintiff must demonstrate that he had at least a reasonable belief that the practices he opposed were unlawful.  *Mayberry*, 55 F.3d at 1092; *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981); *Long*, 88 F.3d at 304.  An employee has engaged in activity protected by Title VII if she has either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  *Long*, 55 F.3d at 1092 (citing 42 U.S.C. § 2000e-3(a)).  "Adverse employment actions" include only "ultimate employment decisions . . . 'such as hiring, firing, granting leave, discharging, promoting, and compensating.'"  *Mota*, 261 F.3d at 519.   To demonstrate causation, plaintiff must demonstrate that "but for" the protected activity, the adverse employment action would not have occurred.  *Id.*

The burden-shifting structure applicable to Title VII disparate treatment cases, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), is also applicable to unlawful retaliation cases.  *Id.*  (citing *McMillan*, 710 F.2d at 1116.)  Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action, which in turn, leads to the ultimate question of retaliation.  *Id.*  Therefore, the "ultimate issue" in a retaliation case, whether the defendant discriminated against plaintiff because plaintiff engaged in protected conduct, involves the finding of a "but for" cause, whereas the causal link necessary for a *prima facie* case involves merely a showing that the plaintiff's protected conduct was a "substantial element" in the

defendant's decision to terminate.  *Id*. at n. 4. (citing *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984)).

As described above with respect to the tangible employment decisions or employment actions which are required for a *quid pro quo* claim, Anderson's experiences at UV Systems and with other employees, after the incident with Gobulukoglu, do not rise to the level of an adverse employment action.  The Court of Appeals has stated, "[w]e have held, along with many of our sister circuits, that employment actions are not adverse where pay, benefits and level of responsibility remain the same."  *Kroger*, 170 F.3d at 512; citing *Eastman Kodak*, 104 F.3d. at 708-10.  As discussed *supra*, Anderson's constructive discharge, to the extent she can prove such, may fulfill the requirement for an adverse employment action.  Otherwise, she was never actually terminated, nor did she suffer any other kind of adverse employment action.

To show that a causal connection could exist between some protected activity, perhaps Anderson's complaint to Summrall, and any consequent constructive discharge, Anderson would somehow have to allege that conditions became so intolerable in those final three weeks that she was forced to resign.  As a matter of law, however, she cannot sustain this burden.  She alleges that she was forced to wait in an office for over three hours, she was asked by Harrell Ellis whether Gobulukoglu could return to work, she was made an outcast by fellow employees because UV Systems failed to control rumors, and she received reprimands regarding her tardiness and unauthorized use of the computer.  (Doc. 37, pp. 9-10.)

Mr. Ellis averred that he discharged Gobulukoglu after asking Anderson if she would feel uncomfortable if Gobulukoglu returned to work (Doc. 25, H. Ellis Aff., Exh. 2, p. 2, ¶ 5.); Anderson admits this was the question, and that Mr. Ellis had a legitimate interest in asking her this question.  (Doc. 47, Anderson Depo, pp. 259-62.)  Anderson also admits the most she actually received for arriving late to work was a written reprimand, and she was not demoted, her pay was not cut, nor was she suspended.  (*Id*. at pp. 274.)  Anderson's reprimand for tardiness, her temporary isolation in a cubicle/office during the investigation on August 26th, and her subjective feeling that she was made an outcast, all such assertions do not rise to the level of an adverse employment action required to show retaliation.  *See Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 532 n.2 (5th Cir. 2003) (citing cases) (Noting that activities which are not ultimate employment decisions include ostracism by coworkers, loss of some job duties, formal discipline, verbal remprimands, and threats of potential dismissal.).  Hostility from fellow employees and

resulting anxiety do not constitute adverse employment actions. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997) (*citing Landgraf v. USI Film Prods*, 968 F.2d 427, 431 (5th Cir. 1992)). Furthermore, criticism of Plaintiff's tardiness, while it may increase the possibility that Anderson could suffer an adverse employment action in the future, does not "rise above having mere tangential effect on a possible future ultimate employment decision." *Id*. at 708. Therefore, Anderson's retaliation claim must fail.

### D.   Constructive Discharge

When a resignation occurs, the question becomes whether or not plaintiff can demonstrate proof of constructive discharge. *Id*. Constructive discharge can form the basis of a Title VII claim. *Guthrie v. Tifco Indus.*, 941 F.2d 374, 377 (5th Cir. 1991) (*citing Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 925 (5th Cir. 1982) ("The constructive discharge doctrine applies when an employee has resigned his employment under such circumstances that his resignation is treated as a discharge for the purpose of proving a prima facie case of employment discrimination.")

Anderson bears the burden of showing constructive discharge. *See Jurgens v. Equal Employment Opportunity Commission*, 903 F.2d 386, 390-91 (5th Cir. 1990). "A resignation is actionable under Title VII, allowing the plaintiff to seek compensatory damages for events after the resignation, only if the resignation qualifies as a constructive discharge." *Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 566 (5th Cir. 2001). To establish hostile work environment, Anderson must first establish that the offending behavior was sufficiently severe or pervasive so as to alter the conditions of her employment; beyond that, and to prove constructive discharge, Anderson must show the she suffered harassment or discrimination so intolerable that a reasonable person would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S. Ct. 2342, 2354 (2004) (citing cases). Courts have considered the following factors when determining whether a reasonable employee would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable that the employees's former status. *See Brown*, 237 F.3d at 566 (*citing Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir.

2000)).   However, "constructive discharge requires a greater degree of harassment than that required by a hostile environment claim."  *Id.* (*citing Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir. 1998)).   Discrimination alone, or a discriminatory failure to promote, without aggravating factors, will not prove a claim of constructive discharge.  *Id.* (*citing Boze v. Branstetter,* 912 F.2d 801, 805 (5th Cir. 1990)).   Because the court does not find the alleged harassment suffered by Anderson to be sufficient to state a hostile work environment claim, there can be no way that she meets the greater degree of harassment required for constructive discharge.

Furthermore, "part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."  *Webb v. Cardiothoracic Surgery Assocs., P.A.*, 139 F.3d 532, 539 (*citing Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5 th Cir. 1987) (*quoting Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)).  Here, UV Systems took prompt remedial action, removing Gobulukoglu from work and then terminating him.  As found by the Fifth Circuit Court of Appeals, prompt remedial action alone is fatal to a claim of constructive discharge.  *Id.* (*citing Dornhecker*, 828 F.2d at 310 ("Because [the employer's] prompt response was the antithesis of 'inaction,' [the plaintiff] was not constructively discharged.")).

### E.     Plaintiff's Negligence Claims

Defendants point out that Anderson's claims of negligent hiring, negligent supervision, negligent retention and negligent training are preempted by the exclusive remedy provision of the Texas Workers' Compensation Act (Tex. Lab. Code Ann. § 408.001), and that such claims must fail as a matter of law because neither proximate causation nor foreseeability can be shown.

Defendant UV Systems asserts that Anderson's claims of negligent hiring, negligent supervision, negligent retention, and negligent training (Doc. 1, Original Complaint, Section E, ¶ 48) are preempted by the "exclusive remedy" provision of the Texas Workers' Compensation Act, Tex. Lab. Code Ann. § 408.001 (Vernon 1996).   During Anderson's employment with UV Systems, she was covered by workers' compensation insurance policy effective at the time that afforded benefits to employees for work-related injuries.  (Doc. 25, H. Ellis Depo., p. 10, ¶ 22; H. Ellis Depo. Exh. H.)  Texas Workers' Compensation provides the exclusive remedy for injuries sustained by an employee in the course of her employment as the result of her employer's alleged

negligence.  *Ward v. Bechtel Corp.*, 102 F.3d 199, 203-204 (5th Cir. 1997).  Hence, because Anderson alleges she was harmed by another employee while trying to do her job and that UV Systems failed to respond adequately, Anderson's negligence claims are preempted by the Workers' Compensation Act.  *See id*. at 204.

> ### F.    Plaintiff's Intentional Tort Claim for Infliction of Emotional Distress

To recover under the tort of intentional infliction of emotional distress ("IIED"), a plaintiff must prove that (1) the defendant acted intentionally or recklessly, (2) the conduct was "extreme and outrageous," (3) the actions of the defendant caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe.  *Standard Fruit and Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998) (*citing Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)).  There is no allegation that Gobulukoglu intended to cause Anderson's alleged mental injury, nor could there be as Gobulukoglu was performing his picture taking surreptitiously.  In *Johnson*, the court held that this tort was available "only in those situations in which severe emotional distress is the intended consequence or primary risk of the actor's conduct," where "the tortfeasor desired or anticipated that the plaintiff would suffer severe emotional distress."  *Id*. at 67.  In *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 441-442 (Tex. 2004), the Texas Supreme Court addressed a situation wherein plaintiff had brought both a sexual harassment claim under the Texas Labor Code and a claim for IIED.  Following its precedent in *Johnson*, the court held that as the IIED claim was a "gap filler" tort such that "when the gravamen of a plaintiff's complaint is the type of wrong that the statutory remedy was meant to cover, a plaintiff cannot maintain an intentional infliction claim, regardless of whether he or she succeeds on, or even makes, a statutory claim;" however, the court additionally stated that such an IIED claim could be brought if "there are additional facts, unrelated to sexual harassment, to support an independent tort claim for intentional infliction of emotional distress."  *Id*. at 441, 448; *See also Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816-818 (Tex. 2005).  In the instant action, the alleged incident which forms the basis of Anderson's Title VII statutory claims is identical to the allegations which form the basis of her IIED claims, and therefore her IIED claim cannot survive.

Furthermore, because Gobulukoglu's actions would be considered intentional acts, the general rule in Texas is that a corporation is not liable for intentional torts committed by its employees unless the conduct was "within the scope of the general authority of the servant" and

"in furtherance of the corporation's business."  *Aguina v. Sanmina Corp.*, No. 3:97-CV-1026-G, 1998 WL 241260, at *2 (N.D. Tex. May 4, 1998) (*citing Valdez v. Church's Fried Chicken, Inc.*, 683 F. Supp. 596, 610 (W.D. Tex. 1988); *Tierra Drilling Corp. v. Detmar*, 666 S.W.2d 661, 663 (Tex.App. - Corpus Christi 1984)).  Evidently Gobulukoglu had turned aside from his work-related tasks when he decided to attempt to photograph Anderson, and UV Systems could not be held responsible for his acts.  However, because there is no evidence that Gobulukoglu intended to cause Anderson's distress and because Gobulukoglu has never even been served in the instant action, recovery against him for IIED is dismissed.

### G.    Invasion of Privacy

With respect to intentional torts outside the scope of Gobulukoglu's authority and the business of UV Systems, the same argument would apply to shield UV Systems from claims that Gobulukoglu intentionally invaded Anderson's privacy; invasion of privacy is an intentional tort.  *See Aguina*, 1998 WL 241260, at *4 (citing *Childers v. A.S., a Minor Child*, 909 S.W.2d 282, 291 (Tex. App. – Fort Worth 1995)); *See Billings v. Atkinson*, 489 S.W.2d 858, 860 (Tex. 1973).

One tort for the invading of privacy involves the public disclosure of highly intimate private facts.   In order to establish this tort, a plaintiff must prove (1) that the publicized information 'contains highly intimate or embarrassing facts about a person's private affairs, such that its publication would be highly objectionable to a person of ordinary sensibilities,' (2) that such information was 'communicated to the public at large,' not simply to 'a small group of persons,' and (3) 'that the information publicized not be of legitimate concern to the public.'" The court does not find that such a tort is sustainable as the pictures taken of Anderson, to the extent they were revealing, were seen only by a small group of persons who viewed the images for purposes of saving or maintaining them and investigating her work related claims; the photos were not shown to the public at large. *Id*. at *5 (*citing Industrial Found. of the South v. Texas Indus. Accident Bd.*, 540 S.W.2d 668, 683-84 (Tex. 1976)("[p]ublicity requires communication to more than a small group of persons; the matter must be communicated to the public at large, such that the matter becomes one of public knowledge.")).

Another tort involves an intentional intrusion upon the seclusion or solitude, or into the private affairs of another, i.e., the plaintiff, in a manner highly offensive to a reasonable person.

*See Farrington v. Sysco Food Serv's Inc.*, 865 S.W.2d 858, 859 (Tex.App. - Houston [1st Dist.], 1993, writ denied) (citing *Gill v. Snow*, 644 S.W.2d 222, 224 (Tex.App.-Fort Worth, 1982)).  The court first recognized such a right of an individual in *Billings v. Atkinson*, 489 S.W.2d at 860; *See Indus. Found. of the South*, 540 S.W.2d at 682.  However, an employee's privacy is not unreasonably intruded upon by an employer's investigation into matters that are directly related to its business interests.  *See Patton*, 910 F. Supp. at 1276.  The investigation of whether Gobulukoglu had committed the acts alleged for purposes of disciplining him or for other action against him was a matter that became UV System's affair when Anderson made her complaint.  Hence, the court does not find that there a question of law exists whether UV Systems, Sumrall, or the Ellises invaded Anderson's privacy while investigating her claims.

Accordingly, it is hereby

ORDERED that Motion of Defendants Ultraviolet Systems, Inc., Harrell Ellis, Ireta Ellis, and Ernest Sumrall for Summary Judgment (Docket Instrument No. 25) is GRANTED, and such Defendants are hereby dismissed from the suit; the court also does not retain any civil claim for intentional infliction of emotional distress, invasion of privacy, or intrusion into the seclusion, solitude, or into the private affairs of Plaintiff, Bonnie Anderson, which would remain pending solely against Defendant Ismail Gobulukoglu, as such are denied because Plaintiff has failed to serve Defendant Gobulukoglu; and, it is further

ORDERED that Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint (Doc. 44) is DENIED.

SIGNED at Houston, Texas, this 29th day of July, 2005.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE